FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 JUL 24 AM 8: 51



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 74777-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| RONALD L. KIRKWOOD, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 24, 2017 |

TRICKEY, A.C.J. — In order to support convictions for multiple counts of sexual abuse alleged to have occurred during the same charging period, the evidence must permit the jury to distinguish and unanimously agree on specific and distinct acts constituting each count. In the case of a resident abuser, the victim's generic testimony may be sufficient. Here, the State's evidence, which included both the defendant's admissions after his arrest and the victim's testimony describing multiple sexual assaults of a similar nature perpetrated by her stepfather, was sufficient to permit the jury to find Ronald Kirkwood guilty of four counts of first degree rape of a child. We affirm the convictions, but remand for the trial court to strike or modify the unconstitutionally vague community custody condition that prohibits Kirkwood from entering places where minors congregate.

FACTS

Ronald Kirkwood and Lori Sasse married in 2000. Kirkwood became the stepfather to Sasse's three children, including her daughter, D.S., who was born on July 21, 1998.

One evening in December 2013, when D.S. was 15 years old, she was home alone with Kirkland. D.S. entered Kirkland's bedroom to say goodnight and Kirkland offered to give her a backrub. Kirkwood told D.S. she was a "beautiful young lady," which made her feel uncomfortable.[1] After rubbing her shoulder, Kirkwood lowered D.S.'s yoga pants, put his hands partially under her pants, and massaged her hip area. He then pulled down the covers and exposed his erect penis to her. Kirkwood told her it was "natural" and "okay."[2] D.S. left the room and barricaded herself in her bedroom.

When Sasse came home later that evening, D.S. was locked in her bedroom and distraught. This was unusual behavior for D.S. and Sasse asked Kirkwood what had happened. Kirkwood responded that it was "really nothing" and he "didn't mean to do it."[3] Sasse noticed that Kirkwood had been drinking. D.S. eventually let her mother enter her bedroom and told her about the incident.

A few weeks later, in January 2014, Kirkwood left the home to work in Nevada. After Kirkwood was gone, D.S. disclosed that Kirkwood had sexually abused her multiple times over the course of several years when she was a young child.

---

[1] Report of Proceedings (RP) at 387.
[2] RP at 390, 394.
[3] RP at 479.

According to D.S., who was 17 years old when she testified at trial, Kirkland began sexually abusing her when she was about five years old and the family lived on North Fork Road in Whatcom County. The family resided in that home from 2000 until approximately 2009. The first incident D.S. could recall took place after she had a bath. Kirkwood was wearing an orange work shirt and jeans. D.S. had a skin irritation in the vaginal area. Although D.S. told Kirkland the rash had gone away, he insisted that he needed to check and told her to lie down. Kirkwood kneeled down and rubbed her vaginal area with his thumb and index finger. After a few minutes, he began to lick her vagina. This continued for several more minutes. Kirkwood told her to "relax," that it was "okay," and that he was only looking at her rash.

D.S. said that after the first incident, Kirkwood assaulted her again a couple of months later, and continued to assault her in a similar manner once or twice every couple of weeks. After the first time, Kirkwood did not use the excuse of checking her vagina for medical reasons.

D.S. said that each act happened in her bedroom, after the sun set, and usually after she had a bath. Kirkwood would always ask D.S. to lie down and sometimes would only put this finger in her vagina. Most of the time, he also performed oral sex on her. The assaults generally lasted for approximately 10 minutes. D.S. tried to avoid Kirkland and also tried to prevent him from assaulting her by squirming or by misbehaving.

D.S. explained that she felt she had to do what Kirkwood told her because he was her parent, and that she did not tell anyone because she was scared.[4] She also said that Kirkwood occasionally reminded her that it was a secret and that, shortly after the first incident, he specifically told her that no one would believe her if she told. D.S. testified that Kirkwood stopped physically abusing her around the time she was in the fourth grade, but he continued to make inappropriate comments about her body and development.

Although D.S. was afraid and reluctant to involve law enforcement, after these second disclosures, Sasse contacted the police.

Detective Eric Francis, a Whatcom County police officer, interviewed Kirkwood twice in March 2014. In the first interview, Kirkwood denied any inappropriate contact with D.S. About 10 days later, after he was arrested, Kirkwood admitted that he had consumed some alcohol on the night of the December 2013 incident and had inappropriately touched D.S. on her buttocks. In a second recorded interview immediately following this disclosure, Kirkwood admitted that on the night in question, his hands "wandered" down to D.S.'s hip and that he may have had "half" of an erection when he pulled the covers back and went to the bathroom. Eventually, Kirkwood also admitted that he had sexual contact with D.S. when she was a young child. He estimated that the contact occurred approximately four or five times. He denied penetrating her with his finger, but said he may have used his tongue. He said that the sexual contact with D.S. stopped a couple of years before the family moved out of the house on North Fork Road when he came to the "realization" that what he was

---

[4] RP at 404

4

doing was wrong and was "not a good thing."[5]  Kirkwood said he never tried to get help or treatment of any kind because he was too embarrassed and ashamed to discuss it.

The State charged Kirkwood with four counts of rape of a child in the first degree.  The State alleged that each offense took place between July 21, 2003 and July 20, 2007.

At trial, Kirkwood denied any sexual intent when he touched D.S. in December 2013.  He also categorically denied any type of sexual contact with D.S. when she was a child.  He explained that when he talked to Detective Francis in March 2014, he was suffering from severe head pain, was confused, and was trying to "make things fit" with what the detective was telling him.[6]

The jury convicted Kirkwood on all counts.

## ANALYSIS

### Sufficiency of the Evidence

Kirkwood concedes that D.S.'s testimony was sufficiently detailed with respect to the first incident of sexual abuse and that the testimony supports one count of rape of a child.  However, challenging the other three counts, Kirkwood contends that D.S.'s testimony about subsequent acts was merely "generic and nondescript."[7]  He maintains that D.S.'s testimony that the abuse happened

---

[5] Ex. 7, 10, 15.
[6] RP at 836.
[7] Appellant's Br. at 8.

"periodically" and "repeated times" failed to adequately describe the number of assaults or identify the general time period.[8]

The constitutional right to a jury trial requires that the jury be unanimous as to the specific act the defendant committed for each crime. State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), overruled in part by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). To protect this right, the State may elect an act to rely on for conviction or the court must instruct the jury "that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt." Petrich, 101 Wn.2d at 572. "In sexual abuse cases where multiple counts are alleged to have occurred within the same charging period, the State need not elect particular acts associated with each count so long as the evidence 'clearly delineate[s] specific and distinct incidents of sexual abuse' during the charging periods." State v. Hayes, 81 Wn. App. 425, 431, 914 P.2d 788 (1996) (quoting State v. Newman, 63 Wn. App. 841, 851, 822 P.2d 308 (1992)). When the State charges identical counts, the trial court must also instruct the jury "that they are to find 'separate and distinct acts' for each count." Hayes, 81 Wn. App. at 431 (quoting State v. Noltie, 116 Wn.2d 831, 842-43, 809 P.2d 190 (1991))

Kirkwood does not argue that the trial court failed to properly instruct the jury. Instead, he claims that the evidence was not sufficiently specific to permit the jury to distinguish among multiple incidents and to agree on three separate and distinct incidents of sexual intercourse. The trial court rejected this argument when it denied Kirkwood's post-sentence motion to arrest judgment. "Evidence

---

[8] RP at 404-05.

is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Hayes, 81 Wn. App. at 430.

Balancing the rights of the accused and the young victims of multiple sexual assaults, this court has concluded that "generic" testimony may be sufficient to support a conviction for multiple counts of sexual assault if it meets certain minimum requirements. State v. Jensen, 125 Wn. App. 319, 327, 104 P.3d 717 (2005). Generic testimony consists, for example, of a victim's estimation that abuse occurred "'once a month for three years,'" which "'outlines a series of specific, albeit undifferentiated, incidents each of which amounts to a separate offense, and each of which could support a separate criminal sanction.'" Hayes, 81 Wn. App. at 437 (internal quotation marks and emphasis omitted) (quoting People v. Jones, 51 Cal. 3d 294, 792 P.2d 643 (1990)). Due process requires that in order for such generic testimony to support multiple counts of sexual abuse, the victim must be able to describe:

> (1) the kind of act or acts with sufficient specificity for the jury to determine which offense, if any, has been committed; (2) the number of acts committed with sufficient certainty to support each count alleged by the prosecution; and (3) the general time period in which the acts occurred.

Jensen, 125 Wn. App. at 327.

The first prong requires a sufficient description of the acts at issue. In State v. Hayes, the decision in which we set forth the three-prong test, the first prong was met by the victim's testimony that the defendant "'put his private part

7

in mine.'" 81 Wn. App. at 438. That statement alone sufficiently described the act to allow the trier of fact to determine what offense had been committed, but additional details added to the specificity. Hayes, 81 Wn. App. at 438. The victim also described the defendant's usual course of conduct, testifying that it happened in his bed, with him on top of her, and that he used paper towels to clean up afterward. Hayes, 81 Wn. App. at 438.

D.S. provided a similar level of detail in her testimony. She specifically described the first incident of sexual abuse and then described Kirkwood's usual course of conduct thereafter. She testified that Kirkwood would always enter her bedroom, at night, usually after she had a bath, and would tell her to lie down. He would then touch her vaginal area, usually put his finger inside her vagina, and, almost always, perform oral sex on her. She testified that the events happened in the same way every time. This testimony describes the acts with sufficient specificity to satisfy the first prong.

The second prong requires the victim to describe the number of acts with sufficient certainty to support each count. In Hayes, the victim's statements that it happened at least "four times" and up to "two or three times a week" was sufficient to support convictions of four counts of rape of a child. 81 Wn. App. at 439. Thus, the testimony need not be certain about the specific number of acts. The victim may provide varying estimates and still satisfy the prong as long as the victim's estimates support the counts charged.

Kirkwood was charged with four counts of child molestation. Although D.S. did not provide an exact number of times sexual intercourse occurred, she

indicated that it occurred many more than four times—once or twice every "couple of weeks" over a period of approximately five years.[9] This testimony was sufficiently certain to support each count and satisfies the second prong.

The third prong requires the victim to testify to the general time period in which the acts occurred. The charging period in Hayes was based on the victim's testimony that the acts occurred when she lived alone with Hayes, when she lived with Hayes and his girlfriend, and after she and Hayes moved out of the girlfriend's house. 81 Wn. App. at 427, 429. The court held that the evidence about the timeframe satisfied the third prong. Hayes, 81 Wn. App. at 439.

Here, D.S. testified that she was about five years old and not yet in kindergarten when the first incident occurred. She estimated the timing of the first incident based on the appearance of her bedroom and the fact that her bedroom closet doors had not yet been removed. D.S. testified that Kirkwood continued to regularly sexually assault her until approximately the fourth grade. The charging period spanned four years, from D.S.'s fifth birthday until her ninth birthday. D.S. defined the time period of the acts by providing her age when the abuse started and her grade when it finally stopped. The charging period encompasses the period that D.S. described. Accordingly, her testimony satisfies the third prong.

D.S.'s testimony was sufficiently specific under all three prongs. In addition, her testimony was corroborated by Kirkwood's admission to four or five instances of sexual contact with D.S. during the charging period. Viewed in the light most favorable to the State, the evidence established the occurrence of

---

[9] RP at 405.

multiple specific and distinct acts of sexual intercourse that took place between July 21, 2003 and July 20, 2007 to support Kirkwood's conviction of four counts of rape of a child. D.S.'s failure to identify specific dates and times or to provide additional details about the offenses are factors affecting credibility, but "not necessary elements that need to be proved to sustain a conviction." Hayes, 81 Wn. App. at 437.

### Community Custody Condition

The sentencing court imposed several conditions of community custody as a part of community placement. The following condition prohibits Kirkwood from frequenting places where minors reside or congregate:

> Avoid all places where minors reside or congregate, including schools, playgrounds, childcare centers, church youth programs, parks and recreational programs, services used by minors, and locations frequented by minors, unless otherwise approved by the Department of Corrections with a sponsor approved by the Department of Corrections.[10]

Kirkwood contends that this condition of sentence is unconstitutionally vague.

"The guaranty of due process, contained in the Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution requires that laws not be vague." State v. Irwin, 191 Wn. App. 644, 652, 364 P.3d 830 (2015) (quoting State v. Bahl, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008)). A community custody condition is not vague so long as it: (1) provides ordinary people with fair warning of the proscribed conduct, and (2) has standards that are definite enough to "'protect against arbitrary enforcement.'"

---

[10] Clerk's Papers (CP) at 209.

See Bahl, 164 Wn.2d at 753 (quoting City of Spokane v. Douglass, 115 Wn.2d 171, 178, 795 P.2d 693 (1990)).

"'[I]llegal or erroneous sentences may be challenged for the first time on appeal.'" Bahl, 164 Wn.2d at 744 (quoting State v. Ford, 137 Wn.2d 472, 477, 973 P.2d 452 (1999)). We review community custody conditions for abuse of discretion, and reverse them only upon a determination that they are manifestly unreasonable. Irwin, 191 Wn. App. at 652. A trial court abuses its discretion if it imposes an unconstitutional condition. Irwin, 191 Wn. App. at 652.

We addressed a similar community custody condition in Irwin. In that case, the court imposed a condition prohibiting the offender from "frequent[ing] areas where minor children are known to congregate, as defined by the supervising [community corrections officer (CCO)]." Irwin, 191 Wn. App. at 649 (second alteration in original). This court struck the condition, concluding that the offender could not know whether the prohibition included "'public parks, bowling alleys, shopping malls, theaters, churches, hiking trails and other public places where there may be children." Irwin, 191 Wn. App. at 654. The condition failed to provide sufficient notice that would enable ordinary people to understand what conduct is proscribed. Irwin, 191 Wn. App. at 655. Further, the court noted that the unconstitutional vagueness would not be cured by the ability of the CCO to define the places where minors are known to congregate, as this could lead to arbitrary enforcement. Irwin, 191 Wn. App. at 655.

Following Irwin, Division Two of this court considered another version of this condition in State v. Magana, 197 Wn. App. 189, 389 P.3d 654 (2016). The

11

condition imposed in that case prohibited Magana from frequenting "'parks, schools, malls, family missions or establishments where children are known to congregate or other areas as defined'" by the CCO or treatment providers. Magana, 197 Wn. App. at 200. The court held that this condition was unconstitutionally vague even though it enumerated several specific prohibited locations. The designation of prohibited places was not limited to the listed examples and the discretion conferred on the CCO to define such locations was "boundless." Magana, 197 Wn. App. at 201.

Kirkwood's community custody condition, like the challenged condition in Magana, includes specific examples of places where "minors reside or congregate" such as playgrounds, childcare centers, and schools.[11] But "[a]ll places where minors reside or congregate," is not limited to the illustrative list.[12] And while a prohibition limited to schools, childcare centers, playgrounds, and parks would arguably provide fair notice of the proscribed conduct, the list of specific prohibited locations here includes other ill-defined places such as "church youth programs," "recreational programs," and "services used by minors, and locations frequented by minors."[13] This language does not make it clear which locations Kirkwood is prohibited from entering. Even though the condition does not expressly authorize the CCO to designate other places where minors reside, congregate, or frequent, the sweeping language of the condition provides no standards to protect against arbitrary enforcement. As a result, the condition is unconstitutionally vague.

---

[11] CP at 209.
[12] CP at 209.
[13] CP at 209.

Accordingly, we remand with instructions for the trial court to modify or strike the unlawful condition.

## Appellate Costs

Kirkwood asks that no costs be awarded on appeal. Appellate costs are generally awarded to the substantially prevailing party on review. RAP 14.2. However, when a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency." RAP 14.2. It appears that Kirkwood was represented by private counsel at trial. However, he was found indigent by the trial court in order to seek review of his convictions at public expense and that finding presumptively continues. If the State has evidence indicating that Kirkwood's financial circumstances have significantly improved since the trial court's finding, it may file a motion for costs with the commissioner.

Remanded to strike the unlawful condition but otherwise affirmed.

Trickey, ACJ

WE CONCUR:

Spearman, J.                    Mann, J.

13